814 F.2d 978
 47 Fair Empl.Prac.Cas. 509,
43 Empl. Prac. Dec. P 37,034
Loyd W. JOHNSON; Clyde E. Bayne; Robert J. Earls, Sr.;
Andrew J. Lunsford; Kermit B. Newcomb; James L.
Smith; Jean M. Brogan, Plaintiffs-Appellants,
v.
FLOWERS INDUSTRIES, INC.; Flowers Baking Company of
Lynchburg, Inc.; West Virginia Baking Company,
Defendants-Appellees,
and
Flowers Baking Company of Morristown, Inc., Defendant.
 No. 86-1602.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 7, 1987.
Decided April 2, 1987.
 
 Donald Wise Huffman (Bird, Kinder & Huffman; David B. Hart; M. Lanier Woodrum; Woodrum, Fox, Wooten & Hart, Roanoke, Va., on brief), for plaintiffs-appellants.
 John Karl Anderson (Charles E. Feuss; Arnold & Anderson, Atlanta, Ga.; R. David Barbe; Gardner, Moss & Rocovich; Roanoke, Va., G. Anthony Campbell, Columbia, S.C.; Flowers Industries, Inc.; Michael S. Thwaites; Smith, Currie & Hancock, Atlanta, Ga., on brief), for defendants-appellees.
 Before WILKINSON, Circuit Judge, HAYNSWORTH, Senior Circuit Judges, and SENTELLE, United States District Judge for the Western District of North Carolina, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 Appellants brought this age discrimination suit against Flowers Industries and two Flowers subsidiaries, West Virginia Baking Company (WVB) and Flowers Baking Company of Lynchburg (Lynchburg). Appellants, who worked for WVB, allege that Flowers Industries, the parent company, replaced them with younger Lynchburg employees in violation of the Age Discrimination in Employment Act. Because appellants failed to demonstrate that Flowers Industries maintained anything other than a normal parent-subsidiary relationship with Lynchburg, the district court granted summary judgment for defendants. We affirm.
 
 I.
 
 2
 Until December 1981, the seven appellants worked for Purity Baking Company. Six appellants were routemen, delivering bakery products from a Purity warehouse in Roanoke, Virginia. One appellant worked as a clerk in the company's Roanoke thrift store. In late 1981, Purity was purchased by WVB, a newly-created subsidiary of Flowers Industries. WVB adopted the existing collective bargaining agreement and continued to employ the former Purity routemen and thrift store employees.
 
 
 3
 Purity had been steadily losing money in the Roanoke market for over a year. In January 1982, WVB decided to improve its financial position by closing the Roanoke warehouse and thrift shop. WVB retained two routemen, both over 40, to continue working their Roanoke routes out of another WVB bakery in Bluefield, West Virginia. The remaining Roanoke routemen and thrift store employees, including appellants, were fired.
 
 
 4
 Shortly after the warehouse closed, the Lynchburg Baking Company, another subsidiary of Flowers, reopened the thrift store and began to service several of WVB's old bakery routes. The net effect of the Lynchburg expansion was that a Flowers subsidiary still served the Roanoke market, but with younger employees. Appellants conclude that they were fired, not because WVB was trying to improve its profitability, but because Flowers was trying to shift the Roanoke bakery routes from older WVB employees to younger Lynchburg employees.
 
 
 5
 Appellants have unsuccessfully challenged WVB's decision to close the warehouse in several forums. The employees initially claimed that the warehouse closing violated the collective bargaining agreement. An arbitrator, however, found no violation because the decision did improve WVB's financial position. Appellants' union filed an unfair labor practice charge with the NLRB, but the agency dismissed the charge, noting that "the employer relied on lawful economic considerations in closing (the Roanoke) facility."
 
 
 6
 Appellants finally filed this age discrimination suit in September 1982 against Flowers, WVB, and Lynchburg. In November 1985, the district court granted summary judgment to Lynchburg, finding that the company was not an employer of the former WVB employees. That decision was not appealed. The district court subsequently granted summary judgment to WVB and Flowers, holding that appellants had not established a prima facie case of age discrimination.
 
 II.
 
 7
 To establish a prima facie case, appellants must show that Flowers Industries was the employer of both the WVB and the Lynchburg employees. Flowers cannot be the employer simply because it is the parent company of WVB and Lynchburg. A parent company is the employer of a subsidiary's personnel only if it controls the subsidiary's employment decisions or so completely dominates the subsidiary that the two corporations are the same entity.
 
 
 8
 In the typical discharge case, an employee presents a prima facie case by showing that: (1) he was in the protected age group; (2) he was fired; (3) his job performance met the employer's legitimate expectations; (4) he was replaced by a younger employee. EEOC v. Western Elec. Co., Inc. 713 F.2d 1011, 1014 (4th Cir.1983). The initial three elements are not contested. Appellants try to satisfy the fourth element by arguing that Flowers replaced them with the Lynchburg routemen and store clerks. Flowers denies either firing or replacing the appellants.
 
 
 9
 To satisfy the final element of replacement, appellants must present some evidence that Flowers was the employer of both the WVB and Lynchburg employees. Flowers has conceded solely for purposes of summary judgment that it employed appellants at WVB. The only remaining issue is whether appellants have presented sufficient evidence for a jury to conclude that Flowers is the employer of the Lynchburg routemen and store clerks.
 
 
 10
 The amount of evidence needed to establish an employment relationship depends on the relationship between Flowers and Lynchburg. If Lynchburg were a branch office of Flowers, then Flowers would almost certainly be the ultimate employer because a branch office is simply a subdivision of one corporation. Lynchburg, however, is a Flowers subsidiary, which simply means that Flowers is the majority shareholder of Lynchburg. Because it exercises control as a stockholder, Flowers receives the benefits of the doctrine of limited liability.
 
 
 11
 The underlying purpose of limited liability is to stimulate business investment by permitting individuals to take action in corporate form without the risk of direct liability or involvement. Labadie Coal Co. v. Black, 672 F.2d 92, 96 (D.C.Cir.1982). Business investment is further encouraged by granting limited liability to corporations that form subsidiaries because "if a parent corporation is held liable for the obligations of its subsidiary, the shareholders of the parent are hurt, through the lowering of the value of their investment in the parent." Hackney & Benson, Shareholder Liability for Inadequate Capital, 43 U.Pitt.L.Rev. 837, 872 (1983). Moreover, business decisions proceed on the assumption of limited liability: courts foster stability in commerce by upholding the legitimate assumptions underlying business activity, not by overturning them.
 
 
 12
 Under the doctrine of limited liability, a shareholder is not responsible for the acts of a corporation. The concept is expressed by the colorful metaphor of the corporate veil, which presumes that acts of the corporation are not acts of the shareholder. DeWitt Truck Brokers v. W. Ray Flemming Fruit Co., 540 F.2d 681, 683 (4th Cir.1976). Although Flowers is a corporation, it still receives the protection of limited liability. Olympia Equipment Leasing Co. v. Western Union Telegraph, 786 F.2d 794, 798 (7th Cir.1986); TVA v. Exxon Nuclear Co., Inc., 753 F.2d 493, 497 (6th Cir.1985). Thus, when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer.
 
 
 13
 Flowers retains the benefits of limited liability even if it exercised some control over the Lynchburg subsidiary. If stockholders were liable whenever they exercised their rightful control, limited liability would be a meaningless fiction because few individuals establish a corporation and then ignore it. United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir.1985). As the courts recognize, "(o)wnership of a controlling interest in a corporation entitles the controlling stockholder to exercise the normal incidents of stock ownership, such as the right to choose directors and set general policies, without forfeiting the protection of limited liability." Baker v. Raymond Int'l, Inc. 656 F.2d 173, 180 (5th Cir.1981).
 
 
 14
 Although accorded the "greatest judicial deference", the fiction of corporate separateness is not sacrosanct. Labadie Coal Co., 672 F.2d at 96; DeWitt Truck Brokers, 540 F.2d at 683. Courts will peer behind the corporate veil if the parent dominates the subsidiary "to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." Krivo Indus. Supply Co. v. National Distillers & Chem. Corp., 483 F.2d 1098, 1106 (5th Cir.1973). In an employment context, the parent company can be the employer of a subsidiary's workers if it exercises excessive control in one of two ways.
 
 
 15
 First, the parent could control the employment practices and decisions of the subsidiary. If the parent company hired and fired the subsidiary employees, routinely shifted them between the two companies, and supervised their daily operations, it would be hard to find that the parent was not their employer. Second, the parent might so dominate the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer. For example, the subsidiary may be highly integrated with the parent's business operations, as evidenced by the commingling of funds and assets, the use of the same work force and business offices for both corporations, and the severe undercapitalization of the subsidiary. The parent might also fail to observe such basic corporate formalities as keeping separate books and holding separate shareholder and board meetings.
 
 
 16
 Such situations are the exception, however. The doctrine of limited liability remains the rule. The parent company is the employer only if it "exercises a degree of control that exceeds the control normally exercised by a parent corporation." Armbruster v. Quinn, 711 F.2d 1332, 1338 (6th Cir.1983).* In determining when a parent crosses this line, the courts have found parent corporations to be employers only in extraordinary circumstances.
 
 
 17
 In Armbruster, the court found an employment relationship when the parent corporation hired several of the subsidiary's employees, transferred personnel between the parent and the subsidiary, and handled the subsidiary's payroll. Armbruster, 711 F.2d at 1338. In addition, the parent authorized all subsidiary purchases over $200, managed the subsidiary's accounts receivable, and allowed the subsidiary to use the parent's credit cards. Id. In Baker, the parent was considered an employer because it exercised day-to-day control of the subsidiary, requiring it to follow "very regimented rules". Baker, 560 F.2d at 392. In Trevino, the court found a corporation to be the employer of an unrelated corporation's employees when it hired some of the second company's personnel and authorized the lay offs, recalls, and promotions of other employees. Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir.1983).
 
 
 18
 In sum, the doctrine of limited liability creates a strong presumption that Flowers is not the employer of Lynchburg's employees. If Flowers maintains a normal parent-subsidiary relationship with Lynchburg, then Flowers will retain the benefits of limited liability. Flowers can be the employer only if it controlled Lynchburg's employment practices or operated Flowers and Lynchburg as one corporation.
 
 III.
 
 19
 Appellants have failed to show that the relationship between Flowers and Lynchburg was anything more than a normal parent-subsidiary relationship. Appellants have produced no evidence that Flowers excessively interfered with the business operations of Lynchburg. Lynchburg management is responsible for the daily decisions in such vital areas as production, distribution, marketing, and advertising. In addition, Lynchburg has a separate board of directors and corporate officers, keeps its own business records, maintains separate bank accounts, and files independent tax returns.
 
 
 20
 Appellants argue that Flowers is in control because three of the four Lynchburg directors are also Flowers officers and the role of Flowers' regional representative is to ensure that Lynchburg implements the policy of the parent company. The doctrine of limited liability, however, does not hold that Flowers is an employer merely because it chooses the subsidiary's directors. Jon-T Chemicals, 768 F.2d at 691. ("One-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil.")
 
 
 21
 Nor does the exercise of "oversight" permit disregard of the incidents of separate corporate entities. The district court specified that "the relationship between Flowers and Lynchburg is one of general oversight, not attention to detail, and it is characteristic of a parent-subsidiary relationship." We agree that Flowers did not dominate the business practices of Lynchburg.
 
 
 22
 There is also no evidence that Flowers controlled the employment practices and decisions of Lynchburg. Flowers never hired, fired, promoted, paid, transferred, or supervised any Lynchburg employee. Appellants contend, however, that Flowers controlled the Lynchburg employees because, when one subsidiary replaces another subsidiary in the same geographic market, the parent company must have initiated the changes. To strengthen this inference, the appellants allege that WVB gave its route books to Lynchburg, along with the WVB shelf space at the Kroger supermarkets. They also claim that Lynchburg hired several new employees to service their former routes and reopen the thrift store. Finally, appellants allege that the Flowers representative, Gary Harrison, orchestrated the redistribution of the Roanoke bakery routes from WVB to Lynchburg.
 
 
 23
 Even if these allegations were correct, they might not raise a genuine issue as to whether Flowers employed the Lynchburg workers. Appellants' claims, however, do not find adequate support in the record. Although Lynchburg may have hired new employees, there is no evidence that Lynchburg hired these employees to work the old WVB routes. By contrast, the record shows that the WVB routes were merged with existing Lynchburg routes. In addition, WVB did not simply hand over its routes to the Lynchburg routemen. When WVB withdrew from the Roanoke market, Lynchburg had to compete for the vacated shelf space and actually lost some space to competing baking companies. Finally, the record does not show that Gary Harrison made the day-to-day business decisions of Lynchburg. As the district court found, there is "absolutely no evidence in the record that Flowers had control over Lynchburg personnel decisions."
 
 
 24
 In sum, appellants have not produced sufficient evidence for a jury to find that Flowers was the employer of the Lynchburg routemen and thrift store employees. The district court properly granted summary judgment to WVB and Flowers.
 
 
 25
 AFFIRMED.
 
 
 
 *
 When assessing this control, the courts have used a four-factor test that emphasizes: (1) the interrelation of operations (2) centralized control of labor relations (3) common management and (4) common ownership or financial control. Baker v. Stuart Broadcasting Co., 560 F.2d 389, 392 (8th Cir.1977); Childs v. Int'l Brotherhood of Electric Workers, 719 F.2d 1379, 1382 (9th Cir.1983); York v. Tennessee Crushed Stone Assoc., 684 F.2d 360, 362 (6th Cir.1982). We need not adopt such a mechanical test in every instance; the factors all point to the ultimate inquiry of parent domination. The four factors simply express relevant evidentiary inquiries whose importance will vary with the individual case